IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:05CR82-2 |
| | ) | |
| DONNA ANN BLACKMON, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

BEATY, District Judge.

This matter is before the Court on Defendant Donna Ann Blackmon's Motion to Dismiss

Indictment [Document #48].   Donna Ann Blackmon ("Defendant" or "Blackmon") is charged

with one count of conspiracy to distribute 5 kilograms or more of cocaine hydrochloride under 21

U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A).  Blackmon argues that her indictment should be dismissed

because she alleges that she was promised immunity in exchange for her cooperation in assisting law

enforcement officers.  A hearing was held in the matter on May 6, 2005.

I.     FACTS

The following facts were revealed in the hearing, through testimony and through a recording

made by a video camera in the Louisiana State Police interrogation room.  On March 19, 2005,

Louisiana State Police Trooper Jonathan Odom conducted a traffic stop on a blue 1998 Cadillac

Deville ("Cadillac") with North Carolina registration near Jennings, Louisiana.  Blackmon, the

vehicle's driver and sole occupant, consented to a search of the vehicle that revealed nearly 30

kilograms of cocaine hydrochloride in a hidden compartment.  As a result, Defendant was taken into

custody and transported to the Jefferson Davis Parish Sheriff's Office for questioning.

Throughout Blackmon's videotaped interrogation, during which the officers attempted to

elicit her cooperation, Blackmon expressed her apprehension of going to jail. As she was being led into the interview room, Blackmon told Trooper Martin Zaunbrecher ("Zaunbrecher") that she would assist in any way required to avoid being incarcerated. The interrogation itself was conducted by three Louisiana State Police troopers: Troopers Zaunbrecher and Stephen LaFargue ("LaFargue"), as well as Sergeant Christopher Ivey ("Ivey"). Trooper Zaunbrecher first explained to Blackmon that agents could travel to North Carolina to conduct a controlled delivery of the cocaine; however, to do this they would need detailed information concerning to whom the drugs were to be delivered, whether that person was aware of Blackmon's arrest, and whether Defendant was on a set schedule. When Defendant asked if she would be able to go home that night, Trooper Zaunbrecher answered:

> I'll promise you this right now. If we can find out who these drugs were going to [–] if I can find out who these drugs were going to and they are there and there's a chance we can bring these drugs and somebody gets arrested, you won't go to jail tonight.

(Gov't's Hr'g Tr. of Mar. 19, 2005 Interview of Donna A. Blackmon, at 2 [hereinafter, "Hearing Transcript"].) To that, Blackmon responded, "You can't promise me that. How can you promise me that? How am I going to get home?" (Id.) Trooper Zaunbrecher replied, "Because if you tell me enough information you're going to ride with me to deliver these drugs . . . ." (Id.) Later, Trooper Zaunbrecher continued:

> But, for you to tell me, I've got to advise you of your rights, you have to waive your rights and say you want to talk to me and you want me to help you. I can, and whatever you tell me, I'll bring it to the district attorney's office.

(Id. at 6.) Blackmon answered, "And I'm going to jail tonight, that's the problem." (Id.) Sergeant Ivey rejoined, "We don't know that. Depends on what you tell us." (Id.) Ivey then told Blackmon, "[T]hat dope is here with you right now. If we can put that dope in somebody else's hands, then

2

[–] it's kind of like fishing. You go out fishing, you catch a little fish, you got a limit, you catch a big fish you throw the little fish away . . . ." (Id.) Blackmon later responded, "Ya'll don't understand that I'm scared to death that if I tell ya'll what you want to know that ya'll are going to lock me up anyway." (Id. at 7.)

Shortly thereafter, however, Defendant decided to cooperate. Blackmon was advised of her Miranda rights and signed a written waiver form. The form included the question "Has any threat/promise been made to you?". (Gov't's Resp. Opp'n Mot. Dismiss, Attach. A.) Blackmon first checked the "yes" box, but when Trooper Zaunbrecher told her, "That means I beat you up", she checked the "no" box (Hearing Transcript, at 11.). On the form, the "yes" box is scratched out and Blackmon initialed twice beside the question. (Gov't's Resp. Opp'n Mot. Dismiss, Attach. A.)

Recounting her travels, Blackmon told the officers the details of her trip to Houston, Texas, and her intended return to North Carolina. She stated that she had been hired by David Thomas ("Thomas") to drive several vehicles between North Carolina and Houston. During each trip, Blackmon would drive the Cadillac to a hotel in Houston where she would park, leave the keys in the ashtray and get a room. The Cadillac would eventually disappear from the parking lot; when it reappeared, Blackmon would check-out and drive the vehicle back to North Carolina. After first telling the officers that she had previously made two such trips to Houston, Blackmon later testified that she had made more than the three trips she revealed to the officers. On this particular trip, Blackmon initially claimed that Thomas would pick up the Cadillac upon her return; however, she later recanted, stating that Wayne Fowler ("Fowler"), her cousin's husband who operated a used car business with Thomas, would be picking up the car.

Sergeant Ivey received approval from a superior within the Louisiana State Police to conduct

3

the controlled delivery to North Carolina. However, Trooper Zaunbrecher told Blackmon that she would need to make a telephone call to Fowler to reassure the officers that Fowler had no knowledge of Blackmon's arrest because Defendant had previously stated that she had called Fowler during the traffic stop. Therefore, the officers planned to have Blackmon make a telephone call to Fowler to tell him that she had only received a warning ticket and would be slightly delayed. But Blackmon continued to doubt whether she would be able to go home, saying, "[Y]a'll can't guarantee that I'm going to get to go home tonight." (Hearing Transcript, at 31.) Zaunbrecher told Blackmon that the phone call and any phone messages were important to see if "the cat is already out the bag". (Id.)

Blackmon made the call, which was uneventful, and continued to express her frustration. Blackmon stated, "I cannot believe they [Thomas and Fowler] got me into this." (Id. at 39.) Trooper Zaunbrecher replied, "[H]ere's your chance to get yourself out of it." (Id.) Defendant then asked Trooper LaFargue if she was going to jail. LaFargue told her, "No, not if you, uh, not if this stuff works out . . . ." (Id. at 41.) Blackmon replied, "Look, I don't want to go to prison for no thirty years." (Id.) Trooper LaFargue responded, "That's why we're doing this. It'll help you out doing this." (Id.) Finally, LaFargue stated that they believed that she did not know the cocaine was in the car and said, "[W]e don't want to put you in jail." (Id. at 42.)

To further arrange the controlled delivery, the troopers contacted the Drug Enforcement Administration ("DEA") in Lafayette, Louisiana. While testimony on this point was unclear, presumably, the Lafayette DEA contacted the Greensboro, North Carolina, DEA field office to coordinate the operation. Blackmon and the officers then traveled to Greensboro with the cocaine concealed in the Cadillac. In North Carolina, Blackmon met with DEA Special Agent Billy Denney

4

("Denney"). Special Agent Denney informed her that if she "messed things up", she would face charges in Louisiana. Further, Special Agent Denney told Defendant that any assistance that she provided would be communicated to the United States Attorney's Office. To mask her cooperation, Blackmon was allowed to return home; however, she was instructed not to inform anyone that she had been caught with cocaine in Louisiana.

On March 20, 2005, Blackmon drove the Cadillac to 5048 Ellan Street in Trinity, North Carolina. That same day, she was allowed to attend a family cookout, which Fowler also attended. From March 20 through March 22, 2005, the Cadillac was under surveillance but Fowler never arrived to take the car. On March 22, 2005, Special Agent Denney and Task Force Officer Marty Ferrell ("Ferrell") instructed Blackmon to ask Thomas for payment for the trip.

Equipped with an audio transmitter, Defendant went to Thomas and Fowler Motors to ask Thomas for payment for making the trip to Houston. Thomas told Defendant that he had not sent her on a trip for three weeks and then contacted Fowler via a two-way radio feature on his cellular telephone. Afterwards, Thomas demanded that Blackmon tell him the Cadillac's location and take him to the vehicle, which she did. Thomas then drove the Cadillac to his home in Thomasville, North Carolina, where he was arrested.

After Thomas' arrest, Task Force Officer Ferrell praised Blackmon's role in the controlled delivery. Special Agent Denney told Blackmon that she could leave, but instructed her to remain available to the agents. Thomas, in his interview with police, implicated Fowler and Blackmon in the alleged conspiracy. Fowler was then arrested and stated that Jay Collins, Defendant's boyfriend, had told him that Blackmon had been arrested in Louisiana. Fowler also indicated that Blackmon had revealed her Louisiana arrest to him. Several hours later, Special Agent Denney asked

5

Blackmon to come to his office "to fill some holes." When she arrived, she was arrested by Task Force Officer Ferrell. Special Agent Denney and Task Force Officer Ferrell confronted her about informing Fowler. Blackmon admitted that she had told Fowler of her arrest but claimed that she had only told Fowler that day, March 22, 2005.

Defendant was indicted on March 28, 2005, and arraigned on March 30, 2005. A scheduling order, including a motions deadline of April 13, 2005, was entered. Defendant filed a motion to continue time to file motions on April 8, 2005, and the United States consented to the request. On April 12, 2005, this Court entered an Order [Document #28] extending the time for Defendant to file motions until April 20, 2005, with the Government's responses due by April 27, 2005. Defendant filed a Motion to Suppress on April 20, 2005 [Document #40], and an evidentiary hearing was held before this Court on May 6, 2005. The Court denied Defendant's Motion to Suppress in a written Order [Document #40] on May 20, 2005. On May 31, 2005, Defendant filed the instant Motion to Dismiss the Indictment [Document #48]. The Government filed a responsive motion [Document #51] on June 9, 2005. The Court took the matter under advisement and is now prepared to enter a final decision.

II.     LEGAL STANDARDS

Defendant Blackmon argues that the indictment against her should be dismissed because it was her belief that she had been promised that she would not be prosecuted in exchange for her cooperation. In response, the Government urges that Blackmon has waived immunity as a defense because the instant motion was untimely filed. Furthermore, the Government argues that the Defendant never received a binding non-prosecution agreement from the United States Attorney's Office in the Middle District of North Carolina. For the reasons that follow, this Court finds that

Defendant's Motion to Dismiss must be denied.

    A.  Timeliness of Motion

    Federal Rule of Criminal Procedure 12(b) governs the timing of pretrial motions.[1] <u>See</u> Fed. R. Crim. P. 12(b). Rule 12(b)(3) identifies motions that must be made prior to trial, including motions "alleging a defect in instituting the prosecution . . . [and those] alleging a defect in the indictment or information." Fed. R. Crim. P. 12(b)(3). Rule 12(c) provides that "[t]he court may . . . set a deadline for the parties to make pretrial motions". Fed. R. Crim. P. 12(c)

    However, a motion asserting immunity as a defense is not considered a pretrial motion alleging a defect in instituting the prosecution or one alleging a defect in the indictment or information. Although a defendant may raise immunity as a defense in a pretrial motion, "[f]ailure to raise a[n] . . . objection of immunity *before* trial does not constitute a forfeiture of the objection because the defendant is not forced by Rule 12(b) to assert the objection before the proceedings against him commence." <u>United States v. Jarvis</u>, 7 F.3d 404, 414 (4th Cir. 1993) (emphasis in original). The Notes of the Advisory Committee on the Federal Rules of Criminal Procedure

---

[1]Rule 12(b) provides, in part, as follows:
(2) Motions That May Be Made Before Trial. A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue.
(3) Motions That Must Be Made Before Trial. The following must be raised before trial:
        (A) a motion alleging a defect in instituting the prosecution;
        (B) a motion alleging a defect in the indictment or information--but at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense;
        (C) a motion to suppress evidence;
        (D) a Rule 14 motion to sever charges or defendants; and
        (E) a Rule 16 motion for discovery.
Fed. R. Crim. P. 12(b).

support the position that Rule 12(b) does not require immunity to be raised before trial:

> In one group are defenses and objections which *must be raised* by motion, failure to do so constituting a waiver. In the other group are defenses and objections which *at the defendant's option may be raised* by motion, failure to do so, however, not constituting a waiver . . . [In the second group] of objections and defenses which the defendant at his option may raise by motion before trial, are included all defenses and objections which are capable of determination without a trial of the general issue. They include such matters as . . . immunity . . . ."

Fed. R. Crim. P. 12(b)(1), (2) Advisory Committee Notes (emphasis added) (cited with approval in Jarvis, 7 F.3d at 414). Because motions asserting immunity may be made at any time during proceedings and thus are not properly considered Rule 12(b)(3) pretrial motions amenable to a Rule 12(c) deadline, the right to move for immunity is not waived by the passage of the Rule 12(c) deadline. Therefore, the Court finds that Defendant did not waive the right to move for dismissal based upon immunity due to filing the instant motion on May 31, 2005, some 42 days beyond the Court's April 20, 2005, Rule 12(c) deadline for filing pretrial motions.

B. Transactional Immunity

Turning to the substance of Blackmon's motion, Defendant argues that the indictment against her should be dismissed because she had been promised transactional immunity during the course of her initial interview by officers in Louisiana. "Transactional immunity protects an individual against prosecution for any crime arising from the substance of his immunized testimony." Jarvis, 7 F.3d at 414. Traditional principles of contract law govern grants of transactional immunity in exchange for cooperation. United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996). As such, the Fourth Circuit has recognized the doctrine of "equitable immunity," under which courts may enforce certain informal grants of transactional immunity. Id. However, to enforce an informal non-prosecution agreement, the Court must determine, inter alia, that "(1) an agreement was made" and "(2) the defendant has performed on his side". Id.

8

Turning to the first prong, the Court must determine whether an agreement was made, and if so, whether it was entered into by a party with the authority to bind the United States. See United States v. McHan, 101 F.3d 1027, 1034 (4th Cir. 1996); United States v. Williams, 780 F.2d 802, 803 (9th Cir. 1986) (discussing whether an agreement entered into by law enforcement officers could bind the United States Attorney's Office). To show whether an agreement was made, Defendant "must demonstrate at least a meeting of the minds that the [G]overnment would refrain from . . . prosecuting him in exchange for his cooperation." McHan, 101 F.3d at 1034.

In this case, the facts simply do not indicate a meeting of the minds concerning a non-prosecution agreement in federal court.[2] Throughout her interview by the Louisiana State Police in Jefferson Davis Parish, Blackmon was encouraged to cooperate; however, she was never explicitly promised transactional immunity in return for her aid in the completion of the delivery of the vehicle to North Carolina. While being interviewed in Louisiana, Blackmon was informed by the Louisiana State Police that her participation in the controlled delivery would result in her not being taken into custody *that night*. Although the state troopers did make nebulous statements suggesting that her cooperation could possibly result in her freedom, none were definite enough to constitute an offer of immunity. Moreover, in Louisiana and North Carolina, law enforcement officers explained to Blackmon that her cooperation would be made known to the Jefferson Davis Parish District Attorney's Office and the United States Attorney's Office, respectively, suggesting that the decision to prosecute Blackmon ultimately rested solely with prosecutors and not the law enforcement officials that were interviewing her. Because the Court finds that neither the Louisiana State Police troopers nor the DEA agents ever provided Blackmon with a definite promise of transactional immunity with respect to the charge in the Middle District of North Carolina, Defendant's motion to dismiss must be denied.

---

[2]The Court does not, however, make any finding with respect to whether the Louisiana State Police entered into an agreement with Defendant that she would not be prosecuted in the state of Louisiana in exchange for her cooperation.

9

However, even assuming *arguendo* that the Louisiana State Police and the DEA had entered into a non-prosecution agreement with Blackmon, her assertion of transactional immunity would still fail for want of the United States Attorney's involvement. See Williams, 780 F.2d at 803 ("In general, a promise made by a government employee other than the United States Attorney to recommend dismissal of an indictment cannot bind the United States Attorney.") Although not binding on this Court, the Fourth Circuit held persuasively in United States v. Juvenile Male that "[t]he United States government generally is not bound by its agent's promise to a criminal defendant unless the agent acts with the government's authority." United States v. Juvenile Male, No. 88-5575, 1988 WL 138688, at *2 (4th. Cir. Dec. 20, 1988). In Juvenile Male, Secret Service agents arrested a juvenile in connection with the discovery of a counterfeit currency plant. Id. at *1. After receiving a Miranda warning, the juvenile made two statements implicating himself in the counterfeiting scheme. Id. After he was charged, the juvenile's counsel informed the United States Attorney's Office that the juvenile had been promised immunity by the Secret Service agents in exchange for providing assistance. Id. An investigation by the United States Attorney's Office revealed that the agents had in fact made such a promise; however, the agents "never consulted with or received authorization from the United States Attorney's Office." Id. On appeal, the juvenile contended that the agents "had apparent authority to offer immunity in exchange for his cooperation and that such an offer by government agents with apparent authority is binding on the United States Attorney and the courts." Id. After citing the general rule that the United States cannot be bound by an agent lacking authority, the court went on to note in dicta:

> Circumstances exist, no doubt, whereby the interaction of one government agency with representatives of another government agency could clothe the latter with the authority to bind the former to an immunity agreement. Considering such a possible circumstance in this case, however, is not necessary. The United States Attorney's Office simply did nothing that could be construed as giving the Secret Service agents either actual or apparent authority to enter into an immunity agreement with the juvenile.

Id.

Thus, according to the reasoning of Juvenile Male, it is the United States Attorney's actions

10

in immunity negotiations that are the focal point in determining whether a party other than the United States Attorney can bind that office. The weight of authority appears to support this view that the United States Attorney must have done something to clothe representations of another government agency with authority to engage in handling negotiations as to transactional immunity. See United States v. Fuzer, 18 F.3d 517, 520 (7th Cir 1994) (finding that evidence would be necessary indicating that the Bureau of Alcohol, Tobacco, and Firearms agents had been authorized to offer immunity in order to bind the United States Attorney); Williams, 780 F.2d at 803 (discussing that generally only a United States Attorney can bind the Government).[3] Therefore, the Court must determine whether the United States Attorney did anything that gave the Louisiana State Police or the DEA actual or apparent authority to enter into a transactional immunity agreement on behalf of the United States.

In the instant case, the Government presented unchallenged testimony that neither the Louisiana State Police nor DEA officials informed the United States Attorney's Office of

---

[3]The Court, however, is aware of contrary authority. Prior to Juvenile Male, a district court in Maryland indicated that law enforcement agents acting alone could bind the United States Attorney where investigators made a promise of immunity to a bank robbery witness who later became suspected of complicity. See United States v. Cooke, 650 F. Supp. 991, 993-94 (D. Md. 1987) (holding that a non-prosecution agreement would be enforceable, assuming a later finding that defendant performed on her part.) Additionally, where law enforcement agents have extended promises of immunity, at least two courts have failed to address the distinction between whether the promise was made by the United States Attorney or law enforcement officers. See Jarvis, 7 F.3d at 414-15 (construing an immunity agreement entered into between defendant and Federal Bureau of Investigation agents without noting the involvement of the United States Attorney); United States v. Carillo, 709 F.2d 35 (9th Cir.1983) (enforcing an immunity agreement without mention of the United States Attorney's involvement).

However, this Court finds these cases unpersuasive in determining whether a federal agent can bind the United States Attorney. The Fourth Circuit's unwillingness to follow Cooke in Juvenile Male is persuasive authority that Cooke is not the law in this circuit. Moreover, although Jarvis did construe an immunity agreement between federal agents and a defendant, the Court, in determining that the agreement did not bar prosecution in the case, never reached the question of whether federal agents acting alone can bind the Government. Finally, Carillo, a Ninth Circuit opinion, is not binding on this court and is in fact contradicted by Williams, a later case decided by that court. See Williams, 780 F.2d at 803.

11

Blackmon's Louisiana interdiction or the planned controlled delivery until after Blackmon's arrest in North Carolina on March 22, 2005. Blackmon did not present contradictory evidence showing any involvement of the United States Attorney's Office prior to its initiation of her prosecution. Nor was Blackmon able to show any explicit statement on the part of DEA agents that suggested that they had authority or approval from the United States Attorney to enter into an immunity agreement with Defendant that would allow her to avoid prosecution for her involvement in the charged conspiracy. Therefore, the Court finds that the United States Attorney did not act in any way to confer actual or apparent authority upon either the Louisiana State Police or the DEA. As a result, even if Defendant had been offered transactional immunity by the Louisiana State Police or the DEA, there would still be some uncertainty as to whether any such agreement would have been binding on the United States Attorney's Office in the Middle District of North Carolina. However, since the Court has found that no promise had been made to Defendant by the Louisiana State Police or the DEA, the Court need not reach that point.

Similarly, to the extent that the test to determine equitable immunity has two parts, the Court need not reach the second prong, which considers whether Defendant performed her part of the agreement where the government argues that she did not do so. Because the Court has not found the existence of a binding transactional immunity agreement, it is unnecessary to consider whether Blackmon performed on her part.

III. CONCLUSION

Therefore, based on the above factual findings and conclusions of law, Defendant Donna Ann Blackmon's Motion to Dismiss the Indictment [Document #48] is DENIED.

An Order consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 21st day of July, 2005.

_____
United States District Judge

12